**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMERICAN OVERSIGHT, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 25-cv-719-TSC |
| | ) | |
| | ) | |
| U.S. AGENCY FOR INTERNATIONAL | ) | |
| DEVELOPMENT, et al. | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' PARTIAL MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

FACTUAL AND PROCEDURAL HISTORY ................................................................. 6

STANDARD OF REVIEW ........................................................................................... 10

ARGUMENT ................................................................................................................. 11

I.  AMERICAN OVERSIGHT SUFFICIENTLY STATED A CLAIM UPON
    WHICH THIS COURT CAN GRANT RELIEF AS TO COUNTS I, II, AND III,
    BECAUSE THE AMENDED COMPLAINT ALLEGES USAID'S FAILURE
    TO IMPLEMENT AN ADEQAUTE RECORDKEEPING POLICY AND
    USAID, NARA, AND RUBIO'S FAILURES TO COMPLY WITH
    MANDATORY FRA NOTIFICATION AND REFERRAL OBLIGATIONS.... 12

    A.  Plaintiff Pled Sufficient Facts as to Count One, Alleging Defendants
        USAID and Rubio Failed to Implement an Adequate Recordkeeping
        Policy, Whether That Is a De Facto Policy or an Unidentified Unwritten
        Policy. ............................................................................................... 13

        1.  Defendants' Failure to Identify USAID's Written Recordkeeping
            Policy Suggests that Their Operative Recordkeeping Policy is a De
            Facto Policy. ................................................................. 14

        2.  American Oversight's Amended Complaint Alleges Facts that
            Could Plausibly Lead the Court to Find that USAID's
            Recordkeeping Policy Permits Destruction or Removal of Federal
            Records. ....................................................................... 17

    B.  Plaintiff Pled Sufficient Facts as to Count Two Alleging Defendants
        USAID and Rubio Failed to Perform Nondiscretionary Duties Under the
        FRA by Failing to Recover Records and Report FRA Violations............ 21

    C.  Plaintiff Pled Sufficient Facts as to Count III, Alleging Defendants NARA
        and Rubio Failed to Perform Nondiscretionary Duties Under the FRA to
        Refer the Issue to the Attorney General.................................................... 23

II. THE COURT HAS JURISDICTION OVER THIS CASE, AS AMERICAN
    OVERSIGHT HAS STANDING TO OBTAIN PROSPECTIVE AND
    DECLARATORY RELIEF AND NO CLAIM IS MOOT OR NOT
    REDRESSABLE. ........................................................................................... 25

    A.  Plaintiff Has Established Likelihood of Future Injury Due to Ongoing and
        Continuing Misconduct by USAID, NARA, and Rubio, and Declaratory
        Relief Would Afford Plaintiff Concrete Relief......................................... 26

B.    Plaintiff's Claims Regarding USAID's Records Destruction are Both Redressable and Not Moot Because Defendants Have Not Established Records Are Uncoverable. .......................................................................... 33

C.    Plaintiff's Claims Regarding USAID's Mandatory Reporting Requirement to NARA Are Not Moot. .......................................................................... 35

CONCLUSION ................................................................................................................. 39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Florida v. ICE,*
  2023 WL 6461053 (D.D.C. Aug. 31, 2023)................................................................24

*Advanced Mgmt. Tech., Inc. v. F.A.A.,*
  211 F.3d 633 (D.C. Cir. 2000)....................................................................................33

*Am. First Legal Found. v. Kennedy,*
  2025 WL 1726025 (D.D.C. June 20, 2025)............................................................ 18, 34

*Am. Oversight v. Hegseth,*
  2025 WL 1721995 (D.D.C. June 20, 2025)............................................................ 13, 31

*Am. Oversight v. U.S. Dep't of Veterans,*
  498 F. Supp. 3d 145 (D.D.C. 2020)................................................................ 12, 25, 33

*Ameen v. United States Dep't of State,*
  2021 WL 4148532 (D.D.C. Sept. 13, 2021)...............................................................26

*Armstrong v. Bush,*
  924 F.2d 282 (D.C. Cir. 2001)................................................................ 13, 15, 24, 36

*Arpaio v. Obama,*
  797 F.3d 11 (D.C. Cir. 2015).....................................................................................11

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................................................................12

*Bell Atl. Corp. v. Twombly,*
  55 U.S. 544 (2007) ....................................................................................................12

*Brown v. Gov't of D.C.,*
  390 F. Supp. 3d 114 (D.D.C. 2019)...................................................................... 10, 11

*Cause of Action Institute v. Pompeo,*
  319 F. Supp. 3d 230 (D.D.C 2018).............................................................................33

*Cause of Action Institute v. Tillerson,*
  285 F. Supp. 3d 201 (D.D.C. 2018)............................................................................35

*Citizens for Resp. & Ethics in Wash. v. Pruitt,*
  319 F. Supp. 3d 252 (D.D.C. 2018)....................................................................... 11, 13

*Citizens for Resp. & Ethics in Washington v. Exec. Off. of President,*
  587 F. Supp. 2d 48 (D.D.C. 2008).............................................................................27

*Citizens for Resp. & Ethics in Washington v. S.E.C ("CREW I").,*
  858 F. Supp. 2d 51 (D.D.C. 2012).................................................................27, 29, 31

*Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec.,*
  387 F. Supp. 3d 33 (D.D.C. 2019)..............................................................................15

*Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec. ("CREW II"),*
  2024 WL 1178472 (D.D.C. Mar. 19, 2024) ..................................................24, 27, 34

*Competitive Enter. Inst. v. U.S. Envir. Protec. Agency,*
  67 F. Supp. 3d 23 (D.D.C. 2014)...............................................................................11

*Doe v. Harris,*
  696 F.2d 109 (D.C. Cir. 1982)...................................................................................16

*E.E.O.C. v. St. Francis Xavier Parochial Sch.,*
  117 F.3d 621 (D.C. Cir. 1997)...................................................................................12

*Feldman v. Fed. Deposit Ins. Corp.*,
  879 F.3d 347 (D.C. Cir. 2018) ............................................................................. 11

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ............................................................................................ 26

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
  528 U.S. 167 (2000) ............................................................................................ 33

*Herbert v. Nat'l Acad. of Scis.*,
  974 F.2d 192 (D.C. Cir. 1992) ....................................................................... 11, 25

*Houston v. Pavilion USA 2020, Inc.*,
  2023 WL 1860961 (D.D.C. Feb. 9, 2023) ............................................................ 11

*\*Jud. Watch, Inc. v. FBI "(Jud. Watch II")*,
  2020 WL 5505347 (D.D.C. Sept. 11, 2020) .............................................. 13, 14, 16

*\*Jud. Watch, Inc. v. Kerry ("Jud. Watch I")*,
  844 F.3d 952 (D.C. Cir. 2016) ......................................................................Passim

*Judicial Watch, Inc. v. Pompeo*,
  744 F. App'x 3 (D.C. Cir. 2018) .......................................................................... 34

*Larsen v. U.S. Navy*,
  525 F.3d 1 (D.C. Cir. 2008) ........................................................................... 36, 38

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................ 26

*Mary Ferrell Foundation, Inc. v. Biden*, No. 22-cv-06176 (RS,
  2023 WL 4551066 (N.D. Cal. July 14, 2023) ....................................................... 24

*Motor & Equip. Mfrs. Ass'n v. Nichols*,
  142 F.3d 449 (D.C. Cir. 1998) ............................................................................. 33

*Phoenix Consulting v. Republic of Angola*,
  216 F.3d 36 (D.C. Cir. 2000) ............................................................................... 11

*Prakash v. American University*,
  727 F.2d 1174 ..................................................................................................... 11

*Price v. United States Dep't of Just.*,
  2019 WL 2526439 (D.D.C. June 19, 2019) .......................................................... 23

*\*Project on Gov't Oversight, Inc. ("POGO") v. Nat'l Archives & Recs. Admin.*,
  2024 WL 4286109 (D.D.C. Sept. 25, 2024) .............................................. 19, 22, 24

## Statutes

44 U.S.C. § 3101 .............................................................................................. 1, 12

44 U.S.C. § 3102 ................................................................................................. 12

44 U.S.C. § 3105 ................................................................................ 12, 14, 20, 21

44 U.S.C. § 3106 ............................................................................................ 32, 33

44 U.S.C. § 3106(a) .....................................................................................Passim

44 U.S.C. § 3106(b) ................................................................................. 13, 24, 38

44 U.S.C. § 3301(a)(1)(A) ........................................................................ 13, 19, 30

## Rules

Fed. R. Civ. P. 41(a)(1)(A)(i) ................................................................................. 2

**Regulations**

36 C.F.R. § 1230.3(b) ................................................................................................................. 23

**Other Authorities**

Agency for International Development (USAID) Remote Workers by State, as of June 2024,
    Gen. Servs. Admin., https://files.gao.gov/multimedia/gao-25-107363/interactive/
    107363_map_USAID.html……………………………………………………………………..29

Elon Musk, X.com, (Feb. 3, 2025, 1:54 AM)
    https://x.com/elonmusk/status/1886307316804263979?lang=en ............................................. 9

Fatma Tanis, *Clawing Back Foreign Aid Is Tied to 'Waste, Fraud, and Abuse.' What's the
    Evidence?*, NPR (updated July 17, 2025, 7:41 AM ET), https://www.npr.org/sections/goats-
    and-soda/2025/07/16/g-s1-77847/rescission-clawback-foreign-aid-bill-fraud-waste-abuse.... 9

Offices and Organization Chart, Office of the Inspector General, USAID,
    https://oig.usaid.gov/offices....................................……………………………..……..29

"Unauthorized Disposition of Federal Records," NARA, https://www.archives.gov/records-
    mgmt/resources/unauthorizeddispositionoffederalrecords...............................................37, 38

**INTRODUCTION**

When the Trump Administration in February rushed at warp speed to shutter the United States Agency for International Development ("USAID"), its stated goal for the chaotic shutdown—which moved so quickly and haphazardly that it sparked serious constitutional concerns, resulted in massive layoffs, and halted without notice life-saving aid to countries across the world—was to counter "fraud, waste, and abuse."[1] Amidst the frantic race to render the independent foreign aid agency defunct, the Administration's careless approach to shutting down USAID extended to its consideration of important tools and information that *could* assist the government in tackling fraud, waste, and abuse—including the wealth of information once hosted on USAID's website that provided data on aid efforts throughout the world, and a commitment to ensuring that documents, including public records, were preserved in accordance with federal law.

Now, six months later, as the Trump Administration takes its final steps to shutter USAID once and for all, its policies continue to allow for the destruction of public records in violation of the Federal Records Act ("FRA"), which exists to "maintain[] federal records," by "strictly limit[ing] the circumstances under which records can be removed from federal custody or destroyed." *Jud. Watch, Inc. v. Kerry* ("*Jud. Watch I*"), 844 F.3d 952, 953 (D.C. Cir. 2016); *see also* 44 U.S.C. §§ 3101 *et seq*. These records should be preserved not just because it is required by law, but because they reflect the history of the tumultuous process by which, in his own words, a senior government official "spent the weekend feeding USAID into the wood chipper."[2]

---

[1] Fatma Tanis, *Clawing Back Foreign Aid Is Tied to 'Waste, Fraud, and Abuse.' What's the Evidence?*, NPR (updated July 17, 2025, 7:41 AM ET), https://www.npr.org/sections/goats-and-soda/2025/07/16/g-s1-77847/rescission-clawback-foreign-aid-bill-fraud-waste-abuse.
[2] Elon Musk, X.com, (Feb. 3, 2025, 1:54 AM) https://x.com/elonmusk/status/1886307316804263979?lang=en.

As set forth more fully in the Amended Complaint, the following categories of federal records are currently subject to threatened or actual destruction or removal by USAID:[3]

1. *Separated Employee and Contractor Records on Government-Issued Devices.* As almost every USAID employee or contractor leaves the agency, they are not asked to return their government-issued devices to the agency. While USAID insists in its partial motion to dismiss that "records on official agency applications are automatically captured and retained by the agency," Defs.' Mem. P. & A. Supp. Partial Mot. Dismiss ("Defs.' Br."), ECF No. 16-1, at 12; Kahn Decl., ECF No. 16-2, ¶ 4, it conspicuously omits records on government-issued devices but *not* on official agency applications. This would include documents saved directly on the electronic device or records saved on unofficial applications other than third-party messaging services. USAID's policies only require that departing individuals certify that they have saved federal records from *personal* electronic devices, Kahn Decl. ¶ 7, not the government-issued electronic devices USAID has wiped and will continue to wipe remotely.

2. *Physical Records.* In March 2025, USAID employees were ordered to shred and burn records at the Ronald Reagan Building in Washington, D.C.—records that this Court has already stated may be federal records under the FRA, Transcript of Mot. Hearing ("Tr."), ECF No. 11, 18:7-11. While USAID has updated its policies as to the disposition of physical records since the inception of this litigation, the updated policies only apply to those "physical records" in "USAID spaces in the National Capital Region." Heiman Decl., ECF No. 16-3, Ex. C, ¶¶ 13-14. USAID, as an agency with offices around the United States and the globe, would have physical records not

---

[3] At this time, American Oversight does not oppose dismissal of portions of its claims relating to certain recordkeeping policies. *See* Fed. R. Civ. P. 41(a)(1)(A)(i). American Oversight limits its Count I claims to the following categories of records: employee and contractor records not already saved on USAID systems; physical records; and records stored on USAID's website, to the extent they are subject to impending or threatened removal, alteration, or destruction.

subject to this updated policy, and instead subject to USAID's previous policies that allow or even require the destruction of physical federal records.

3. *Records on USAID's Website.* USAID's website, usaid.gov, and all of the information and data that was stored there, is no longer accessible to the public. The government insists that, despite the lack of public access, all the records and files that were on that website are still maintained and preserved internally. Defs.' Br. at 13; Kahn Decl. ¶ 8. But USAID does not promise to ensure these website records are saved in the future—it can only say that discussions are "ongoing" with Department of State, and "[t]he status of those materials and how they will be housed has not yet been determined." Kahn Decl. ¶ at ¶ 8. To the extent that USAID plans to delete its stored website records as the agency is dismantled, or knows that the State Department plans to delete these records, then the website records are subject to impending or threatened destruction in violation of the FRA.

To address the actual, threatened, or impending destruction or removal of the categories of federal records listed above, the Amended Complaint asserts three counts against USAID, the National Archives and Records Administration ("NARA"), and Marco Rubio, in his official capacities as Acting USAID Administrator and Acting Archivist[4] under the Federal Records Act and the APA:

- Count I challenges USAID's lack of an adequate operative recordkeeping policy. As noted above, USAID's directives are legally inadequate because they appear to allow destruction or removal of (at least some) records saved on government-issued devices during separation; physical records not in Washington D.C. offices; and records saved

---

[4] Marco Rubio currently serves as the Acting Administrator of USAID and the Acting Archivist of the United States, in addition to his role as Secretary of State.

on USAID's website. Further, USAID has conspicuously failed, including in its motion, to state which (if any) of several pre-2025 recordkeeping policies is now operative. In the absence of a specified, operative recordkeeping policy, USAID seems to be operating pursuant to a *de facto* recordkeeping policy that authorizes disposal of federal records beyond any known policy. And the small sections of policies that have been specifically averred to, like the employee separation policy, themselves allow for records to be destroyed or removed. The Court can redress this claim by ordering USAID to identify and provide, in a sworn filing, USAID's operative recordkeeping policy (if it has one). And if that policy is legally inadequate, the Court can order USAID to revise it to satisfy the FRA.

- Count II challenges USAID's and Acting Administrator Rubio's failure to recover unlawfully removed or destroyed records; notify the Archivist of FRA violations; and initiate an action through the Attorney General to recover records. When reports of threatened and actual records removal first emerged, American Oversight wrote to Acting USAID Administrator Rubio asking him to notify the Archivist as is his nondiscretionary obligation under Section 3106(a) of the FRA. While USAID notes that NARA has been "engaged," Defs.' Br. at 16, the FRA demands that, when records may be at risk of removal, the agency head notify the Archivist in order to jumpstart the process to *recover* the records. That has not happened here. The Court can redress this claim by ordering USAID and Acting Administrator Rubio to fulfill his obligations under Section 3106(a) of the FRA.

- Count III challenges NARA and Acting Archivist Rubio's failure to refer this matter to the Attorney General to recover records at risk of removal or destruction. This is an

independent nondiscretionary duty of the Archivist when the agency head has failed to take action. The Court can redress this claim by ordering NARA and Acting Archivist Rubio to refer this matter to the Attorney General to initiate an action for recovery or other redress.

Defendants' arguments that these counts fail to state claims for relief, or are nonjusticiable, rely on a cramped construction of the Amended Complaint at every turn. Defendants treat each count in the Complaint as if the only facts cited in support are those specifically listed under the heading for each count, ignoring the fact that the claims for relief begin after 118 paragraphs and (in accordance with common federal pleading practice) each count begins with "Plaintiff incorporates the allegations above by reference as if fully set forth herein." Furthermore, they focus much of their argument on the events that occurred at the Ronald Reagan Building, while ignoring Plaintiff's broader allegations. And Defendants improperly limit potential ongoing injury to only a handful of American Oversight's pending Freedom of Information Act ("FOIA") requests to USAID—records responsive to which may be "permanent[ly] and irreversibl[ly] destroyed." Tr. 11:14-15.

As set forth in more detail below, Counts I through III state claims for relief and are justiciable under the Federal Records Act and the Administrative Procedure Act. American Oversight respectfully requests that the Court deny Defendants' Partial Motion to Dismiss as to Counts I, II, and III in the Amended Complaint. American Oversight does not oppose dismissal of portions of its claims underlying Count I relating to records other than the following: employee and contractor records not already saved on USAID systems; physical records; and records stored on USAID's website, to the extent they are subject to impending or threatened removal, alteration, or destruction.

## FACTUAL AND PROCEDURAL HISTORY

In early February 2025, USAID's website was abruptly taken down, Am. Compl., ECF No. 12, ¶ 42, and employees were told not to come to work and lost access to email and USAID systems overnight. *Id.* ¶ 45. Almost all employees were placed on leave. *Id.* ¶ 46. American Oversight, an organization dedicated to "ensuring transparency in government and promoting accountability for government officials," First Lewis Decl., ECF No. 5-2, ¶ 2, responded quickly by filing multiple FOIA requests to USAID, Am. Compl. ¶¶ 59-61, 83-93; and notifying then-Archivist Colleen Shogan and to Marco Rubio, the Acting Administrator of USAID and Secretary of State, warning of potential FRA violations at USAID, including potential unlawful destruction or removal of federal records. Am. Compl. ¶¶ 62-66. These letters requested that the recipients take "immediate action" to "preserve and recover any and all . . . federal records." First Lewis Decl. ¶ 7.

American Oversight had not received any response to any of its FOIA requests or letters by March 11, 2025, *id.* ¶ 13, when reports emerged that Erica Y. Carr, the acting executive secretary of USAID, directed USAID employees by email to "[s]hred as many documents first, and reserve the burn bags for when the shredder becomes unavailable or needs a break." Am. Compl. ¶ 48. Employees were told to dispose of documents including "records deriving from other agencies/departments, drafts, duplicates, working papers, reference copies, personal notes, or transitory emails containing classified information but lacking long-term retention value." Carr Decl., ECF No. 7-2, Ex. A. Within hours of these reports, American Oversight sent another letter to Rubio—now the Acting Archivist, in addition to his roles as Acting USAID Administrator and Secretary of State—demanding that he "take immediate action to halt the ongoing destruction of records at USAID, prevent further destruction, and initiate an action through the Attorney General to recover any records that were unlawfully removed." Am. Compl. ¶¶ 68.

That same day, American Oversight filed suit in this action against Defendants USAID, NARA, and Rubio in his official capacity as Acting USAID Administrator and the Acting Archivist. *See generally* Compl., ECF No. 1. Specifically, American Oversight alleged that Defendants USAID, NARA, and Rubio failed to comply with their obligations under the FRA when they did not take steps necessary to report FRA violations and to initiate an enforcement action as required by the Act. *Id.* American Oversight further alleged that USAID and Rubio failed to implement and maintain an adequate recordkeeping system to protect federal records in violation of their obligations under the FRA and that their failure to affirmatively post current policies and directives on the USAID site was in violation of the "reading room" provision of FOIA. *Id.* The next day, Plaintiff moved for a temporary restraining order directing USAID to immediately desist from unlawfully destroying federal records and to provide American Oversight with its recordkeeping and FOIA processing policies. Mot. for Temp. Restraining Order, ECF No. 5.

Defendants responded to the motion with declarations from USAID, NARA, and counsel for Defendants. One USAID declaration described the "vast majority," but not all, of the records destroyed at the Reagan building, Carr Decl. ¶ 6. Another USAID declaration promised that the agency would "not destroy any additional documents stored in the USAID offices of the Ronald Reagan Building without giving notice to the Plaintiff and an opportunity for Plaintiff to raise the issue with the court." Ruth Decl., ECF 8-1, ¶ 3. A declaration from NARA's Acting Chief Records Officer ("CRO") stating NARA had been "made aware of an allegation of unauthorized disposition of USAID records from various sources" and opened an Unauthorized Disposition case. Fischer Decl., ECF No. 7-1, ¶¶ 5, 8. NARA's declaration stated it sent USAID a letter requesting that

USAID provide NARA with further information within 30 days, including "sufficient documentation to support" any finding that "no records were improperly destroyed." *Id*. ¶¶ 10-11.

USAID also provided Plaintiff with copies of some recordkeeping policies, although the provided copies were outdated. Second Lewis Decl. ¶¶ 2-5. The provided copies were dated 2020, while a recordkeeping policy linked in a footnote to Defendants' Opposition to Plaintiff's Motion for a Temporary Restraining Order, ECF No. 7, was dated 2023.[5] Second Lewis Decl. ¶¶ 2-5.

At a March 14, 2025 hearing on Plaintiff's Motion for a temporary restraining order, the Court expressed concerns that USAID's definition of "non-records" was "problematic," and thus "records that need to be preserved for FOIA would have been destroyed." Tr. 18:7-11. Plaintiff's counsel also specified at that hearing that it had not "been able to pin down what, if any, recordkeeping policies [USAID is] following." *Id.* 15:13-15. The Court declined to deny the motion at that time but held it in abeyance. *Id.* 22:15-16. Plaintiff subsequently withdrew its motion. Notice of Withdrawal, ECF No. 10.

On March 28, 2025, a Department of Government Efficiency[6] ("DOGE") employee told remaining USAID employees by email that they would almost all be terminated as part of an upcoming Reduction in Force and could chose to take voluntary administrative leave before that date. Am. Comp. ¶ 50.

On March 31, 2025, Defendants' counsel reached out to Plaintiff's counsel with proposed categories of records USAID considers to be non-records for the purpose of vacating its Washington, D.C. offices and gave Plaintiff 48 hours to object to the proposal. Heiman Decl., Ex.

---

[5] The 2023 version is no longer available at the link provided. Defs.' Br. at 6, *see also* Kahn Decl. ¶ 8.

[6] American Oversight uses the acronym "DOGE" to encompass the U.S. DOGE Service ("USDS") and U.S. DOGE Service Temporary Organization.

A. Plaintiff's counsel timely objected to four categories of information as overly broad and/or potentially responsive to American Oversight's FOIA requests. *Id.,* Ex. B.

On April 24, 2025, a memorandum was sent to USAID employees stating that their government-provided equipment, including iPhones, iPads, and laptops, would be "remotely wiped" at separation, and that previously fired USAID contractors would be contacted to let them know how to wipe their devices remotely. Am. Compl. ¶¶ 51, 54.

On April 30, 2025, Defendants' counsel provided an updated proposal for the purposes of decommissioning office spaces. Heiman Decl.., Exs. C, D. After reviewing the proposal, Plaintiff stated it had no objections but emphasized "the importance of USAID's compliance" with its protocol "and all relevant records retention scheduled (sic) with respect to non-email electronic messages which are not automatically archived under Capstone." *Id.*

On May 9, 2025, Plaintiff filed an Amended Complaint, adding allegations regarding the remote wiping of government-issued devices to its FRA claims. *See generally* Am. Compl. Specifically, Plaintiff alleged that USAID planned "to remotely wipe government-issued devices of employees and contractors . . . permitting further destruction of federal records." Am. Compl. ¶ 74. Plaintiff also added additional FOIA claims, including failure to conduct adequate searches and wrongful withholding of non-exempt responsive records as to USAID. *See* Am. Compl. ¶¶ 82-118, 146-165.

Throughout May and June 2025, the parties conferred regarding, among other topics, the process of remotely wiping USAID employee and contractor government-issued devices. Third Lewis Decl. ¶¶ 2-6. Defendants' counsel provided information regarding that process by email on May 22, 2025 and June 27, 2025. *Id.* ¶¶ 3, 5. On June 30, 2025, Plaintiff's counsel inquired as to whether an employee or contractor's email account can receive email communications if the

individual is on administrative leave, and how long after separation an email address becomes unable to receive incoming emails. *Id.* ¶ 6. American Oversight has not received a response to this inquiry. *Id.* ¶ 7.

On June 30, 2025, Defendants filed a Partial Motion to Dismiss as to Plaintiff's FRA claims Counts I, II, and III. Defendants argue that:

- Plaintiff lacks standing to obtain prospective relief as to Counts I, II, and III for failure to establish sufficient likelihood of future injury;

- Plaintiff lacks standing to obtain declarative relief;

- Plaintiff's Count II claims referring to unlawful destruction of records are not redressable or are moot;

- Plaintiff's Count II claims as to the obligation to notify NARA of unlawful removal of records are moot; and

- Plaintiff fails to state a claim on Counts I, II, and III.

*See generally* Defs.' Br. Plaintiff now files this Opposition to Defendants' Partial Motion to Dismiss.

### STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint, and the moving party bears the burden of demonstrating the complaint's legal insufficiency. *See Brown v. Gov't of D.C.*, 390 F. Supp. 3d 114, 122 (D.D.C. 2019). "A complaint serves the specific functions of giving notice of the general nature of the case and the circumstances or events upon which it is based, so the parties can prepare and the court can dispose of the case properly." *Id.* (citation modified and internal quotations omitted). "Although detailed factual allegations are not necessary to withstand a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter, accepted

as true, to state a claim to relief that is plausible on its face." *Citizens for Resp. & Ethics in Wash. v. Pruitt*, 319 F. Supp. 3d 252, 256 (D.D.C. 2018) (internal quotations omitted). On a motion to dismiss, the Court must "accept as true all of the allegations contained in [the] complaint," save for legal conclusions. *Brown*, 390 F. Supp. 3d at 122 (internal quotations omitted). And, at this stage, a plaintiff is "entitled to the benefit of all reasonable inferences. . . ." *Competitive Enter. Inst. v. U.S. Envir. Protec. Agency*, 67 F. Supp. 3d 23, 34 (D.D.C. 2014).

In reviewing a motion to dismiss under Rule 12(b)(1), the plaintiff "bears the burden of invoking the court's subject matter jurisdiction," including establishing "injury in fact, causation, and redressability." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). While the court "may properly consider allegations in the complaint and evidentiary material in the record . . . [it] is obligated, at this threshold stage, prior to any discovery, to accord [plaintiff] the benefit of all reasonable inferences." *Feldman v. Fed. Deposit Ins. Corp.*, 879 F.3d 347, 351 (D.C. Cir. 2018) (citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 n. 6 (D.C. Cir. 1992)). The Court must "resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss," *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000), but must also "give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Id.* (quoting *Prakash v. American University*, 727 F.2d 1174, 1179-80 & nn.36-37 (D.C. Cir. 1984)).

## ARGUMENT

In the D.C. Circuit, when there is a factual challenge to jurisdiction such that the jurisdictional facts are "intertwined with the merits of the case," it may be "improper" to "rul[e] on a Rule 12(b)(1) motion . . . before the plaintiff has had a chance to discover the facts necessary to establish jurisdiction." *Herbert*, 974 F.2d at 198. As this case is predicated on "disputed facts . . . which ultimately bear[] on whether the Court has" jurisdiction, *Houston v. Pavilion USA 2020,*

11

*Inc.*, No. CV 22-00383 (CKK), 2023 WL 1860961, at \*7 (D.D.C. Feb. 9, 2023), to rule on the 12(b)(1) motion where key facts remain in dispute would "short-circuit the factual development and adjudicative process to which a plaintiff is generally entitled." *Am. Oversight v. U.S. Dep't of Veterans Affs.*, 498 F. Supp. 3d 145, 153 (D.D.C. 2020). *See* Defs.' Br at 1 ("Plaintiff is mistaken about the underlying facts."); 2; 7 fn. 3; 11; 21.

Thus, Plaintiff first addresses the question of whether its Amended Complaint stated claims upon which this Court can grant relief, then addresses the standing and mootness questions which require further factual development.

I. **AMERICAN OVERSIGHT SUFFICIENTLY STATED A CLAIM UPON WHICH THIS COURT CAN GRANT RELIEF AS TO COUNTS I, II, AND III, BECAUSE THE AMENDED COMPLAINT ALLEGES USAID'S FAILURE TO IMPLEMENT AN ADEQAUTE RECORDKEEPING POLICY AND USAID, NARA, AND RUBIO'S FAILURES TO COMPLY WITH MANDATORY FRA NOTIFICATION AND REFERRAL OBLIGATIONS.**

American Oversight pleads sufficient facts to support its allegations that Defendants have violated the FRA by failing to establish adequate policies to safeguard vital agency records and failing to take mandatory actions to recover unlawfully removed or destroyed records. As Defendants seek to dismiss claims under Rule 12(b)(6), it is their heavy burden to demonstrate "beyond doubt" that American Oversight "can prove no set of facts" that would entitle it to relief, *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997), and they fall well short of that burden. Plaintiff's Amended Complaint provides sufficient facts (which must, at this stage, be taken as true) to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 55 U.S. 544, 570 (2007)). These facts demonstrate that Defendants (1) USAID and Acting Administrator Rubio violated 44 U.S.C. §§ 3101, 3102, and 3105 by failing to implement adequate recordkeeping policies as to

12

safeguarding federal records,[7] including employee and contractor records not already saved on USAID systems, physical records, and records stored on USAID's website; (2) USAID and Acting Administrator Rubio failed to perform nondiscretionary duties under 44 U.S.C. § 3106(a); and (3) NARA and Acting Archivist Rubio failed to perform nondiscretionary duties under 44 U.S.C. § 3106(b).

### A. Plaintiff Pled Sufficient Facts as to Count One, Alleging Defendants USAID and Rubio Failed to Implement an Adequate Recordkeeping Policy, Whether That Is a *De Facto* Policy or an Unidentified Unwritten Policy.

"For an FRA claim brought under the [Administrative Procedure Act] to survive a motion to dismiss, Plaintiff must allege facts that could plausibly lead the court to find that the contested policy is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' because [it] permit[s] the destruction of record material that should be maintained." *Jud. Watch, Inc. v. FBI* ("*Jud. Watch II*"), No. CV 18-2316 (RC), 2020 WL 5505347, at *2 (D.D.C. Sept. 11, 2020) (quoting *Armstrong v. Bush*, 924 F.2d 282, 297 (D.C. Cir. 2001)). "Courts assess both formal and informal recordkeeping policies." *Am. Oversight v. Hegseth*, No. CV 25-883 (JEB), 2025 WL 1721995, at *4 (D.D.C. June 20, 2025*); see also Pruitt*, 319 F. Supp. 3d at 258-60 (assessing both); *Armstrong*, 924 F.2d at 296–97 (remanding to evaluate formal policy).

---

[7] Federal records are defined to:

> include[] all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them.

44 U.S.C.A. § 3301(a)(1)(A).

Here, Defendants are unable to even point to a specific written policy that USAID and its staff are following. Meanwhile, some federal records have been destroyed and others are at continued risk of destruction, deletion, or alienation. Plaintiff's allegations, demonstrating the systemic scope of the actual or potential destruction and removal of records, supports the inference that USAID's actual policies were *not* any of the various pre-2025 written recordkeeping policies, but a *de facto* policy established by actions tolerated at—or even required by—the highest level. And if current written policies do exist, the fact that USAID allowed and continues to allow these massive, systemic, and systematic violations justifies the inference that the agency failed to establish adequate safeguards in those policies and make those safeguards "known to officials and employees". *See* 44 U.S.C. § 3105.

Specifically, Plaintiff has alleged that USAID is employing recordkeeping policies that (1) allow deletion or otherwise alienation of employee or contractor records stored on non-USAID applications or directly on government devices after separation from the agency; (2) permit the destruction of physical federal records outside Washington, D.C., and (3) allow destruction of records stored on USAID's website.[8]

      1.  Defendants' Failure to Identify USAID's Written Recordkeeping Policy Suggests that Their Operative Recordkeeping Policy is a *De Facto* Policy.

Defendants argue that Plaintiff has not identified "a single specific provision of USAID's policy to which Plaintiff objects," Defs.' Br. at 19, but this argument has one fatal flaw: Defendants themselves are unable to attest in this litigation to a specific policy that USAID is currently following.

---

[8] While American Oversight's Amended Complaint sufficiently "allege[d] facts that could plausibly lead the court to find" policies relating to other categories of information to violate the FRA, *see Jud. Watch II,* 2020 WL 5505347 at *2; *see also* Am. Compl. ¶¶ 39-81, Plaintiff here limits its argument to only policies relating to these limited categories of information.

14

Judicial review of an agency's actual "recordkeeping guidelines and directives is necessary to protect plaintiffs' interests because, if the guidelines are both inadequate and unreviewed, documents that plaintiffs would otherwise be able to study will be destroyed." *Armstrong*, 924 F.2d at 293. A court cannot accurately adjudge the sufficiency of these guidelines if the agency continuously fails to identify them. And an "unofficial" policy "setting agency-wide compliance with the FRA" is reviewable. *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec.*, 387 F. Supp. 3d 33, 53 (D.D.C. 2019), *amended*, No. CV 18-2473 (RC), 2019 WL 11307644 (D.D.C. July 22, 2019). Such review is especially important when that policy allows for multiple instances of actually or potentially destroyed federal records on a systemic scale. *See* Section I.A.2, *infra*.

Defendants admit that the only policy that they provided to American Oversight is "a recordkeeping policy dated 2020" given to Plaintiff's counsel on March 14, 2025. Defs' Br. at 6. Yet they concede that "the version then available online had been updated in 2023." *Id*. Defendants blamed their "haste to provide documentation" for the error. *Id.* Yet it has been five months since Defendants provided the incorrect policy. Defendants have never clarified which—if any— USAID recordkeeping policies that they consider currently applicable. At the hearing in March, American Oversight stated that it had not "been able to pin down what, if any, recordkeeping policies [USAID is] following." Tr. 15:13-15. Five months later, even after Defendants submitted a 25-page legal brief with two declarations attached, Defendants have *still* not attested which (if any) recordkeeping policy is currently in effect.

15

Plaintiff's claim is not moot because, while Defendants have provided *a* policy, they themselves admit the policy they provided is no longer in effect. Defs.' Br. at 6.[9] Unlike in *Judicial Watch II*, where the court was able to "consider[] . . . the attached FBI recordkeeping policy," 2020 WL 5505347, at *1, here there are multiple potential written policies and unwritten guidelines.

Defendants had the opportunity to specify and provide the active, current recordkeeping policy to Plaintiff in a declaration when filing this Partial Motion to Dismiss but have yet to even declare which policy is the official policy of USAID, let alone provide the full policy to Plaintiff or the Court for review. Defendants cannot rely on a policy they themselves have disavowed to prove that their current policies are consistent with FRA requirements. Nor can they invent a requirement that Plaintiff must point to a specific provision of an outdated policy while simultaneously failing to meet their basic burden of identifying and declaring the operative recordkeeping policy government USAID's records.

Whatever recordkeeping policy Defendants may *now* claim, American Oversight's factual allegations justify the inference that USAID maintained a *de facto* agency-wide recordkeeping policy riddled with holes, permitting the regular destruction and removal of federal records. Defendants suggest that American Oversight's factual allegations citing instances of records destruction are simply impermissible allegations of individual noncompliance with recordkeeping policies. Defs.' Br. at 20. On the contrary: these factual allegations suggest a pervasive *de facto* policy, implemented on a wide scale across the agency.

---

[9] "In considering possible mootness [the court] assume[s] that the plaintiffs would be successful on the merits." *Jud. Watch I*, 844 F.3d at 955 (citing *Doe v. Harris*, 696 F.2d 109, 114 n.7 (D.C. Cir. 1982)).

16

2. American Oversight's Amended Complaint Alleges Facts that Could Plausibly Lead the Court to Find that USAID's Recordkeeping Policy Permits Destruction or Removal of Federal Records.

Plaintiff's Amended Complaint demonstrates that USAID's actual recordkeeping policy—whether that is a pre-2025 policy that USAID has so far declined to confirm as operative; a 2025 policy that USAID has not yet revealed; or a *de facto* policy inferable from its actions—violates the FRA by sanctioning the destruction and removal of records, or, at minimum, failing to adequately safeguard federal records.

As a threshold matter, Defendants improperly limit the factual allegations in support of Plaintiff's Count I to two paragraphs. Defs.' Br. at 19. But Plaintiff clearly states that Count I "incorporates the allegations above by reference as if fully set forth herein." Am. Compl. ¶ 119. As Defendants note in their brief, the Amended Complaint includes numerous factual allegations recounting the chaotic dismantling of USAID and the substantial recordkeeping issues stemming from that chaos. Defendants also inappropriately limit Plaintiff's claims to "USAID's alleged actions on March 11," Defs.' Br. at 20, but the Amended Complaint plainly includes allegations of failure to implement adequate recordkeeping policies outside of that one date. Plaintiff's allegations in its Amended Complaint provide sufficient support for its claims that USAID has failed to implement adequate recordkeeping policies as to employee and contractor records stored on government-issued devices but not in USAID systems; the agency's physical records; and the agency's website records.

Employee and Contractor Records: American Oversight's Amended Complaint includes allegations regarding potential destruction of records during employee separations, including that, in March 2025, USAID staff were informed that nearly all of them would be terminated as part of an upcoming Reduction in Force and that they could choose to take voluntary administrative leave before their termination date, which would cause them to lose access to certain USAID systems.

17

Am. Compl. ¶¶ 50, 52. For separating employees, USAID government-supplied equipment would be remotely wiped at the time of separation—affecting tens of thousands of devices. *Id.* ¶¶ 51, 54. American Oversight pleads that, upon information and belief, USAID employees on administrative leave and previously terminated contractors are unable to back up federal records saved on government-issued devices to government systems before they are remotely wiped. *Id.* ¶¶ 53, 55. This would impair the ability of separating employees and contractors to save federal records that may be stored on those devices. *Id.* ¶ 74.

On these facts, the agency's policy mandating remote wiping of tens of thousands of government devices allows for records to be deleted without the opportunity or technological capability to save those records on USAID systems before the wipe is completed.[10] And any federal records saved on those government-issued devices that would not be destroyed would be removed or lost from the custody of the agency. *Cf. Am. First Legal Found. v. Kennedy*, No. CV 24-1092 (RC), 2025 WL 1726025, at *5 (D.D.C. June 20, 2025) ("individual former employees[']" removal of records could be a violation of the FRA). Therefore, USAID's policies regarding retention of separated employees' and contractors' records, specifically when devices are wiped remotely and not returned to the agency, contravene the FRA's obligation to preserve federal records.

Physical Records: American Oversight pleads that "[o]n March 11, the acting executive secretary for USAID reportedly told agency employees to 'empty out the classified safe and personnel document files,' and '[s]hred as many documents first, and reserve burn bags for when the shredder becomes unavailable or needs a break.'" Am. Compl. at ¶ 48. Records were, in fact,

---

[10] Defendants' claim that employees must confirm that federal records are saved on government systems is insufficient, because that requirement only applies to records on *personal* devices, not government-issued technology. *See* Kahn. Decl. at ¶ 7. For further discussion, *see* Section II.A, *infra.*

destroyed that day, including "drafts," "reference materials," "unclassified" and "classified" documents that staff printed as supporting materials"—all of which may include federal records. *Id.* at ¶¶ 72-73. *See also* Tr. at 18:7-11 (Under USAID's definition, "records that need to be preserved . . . would have been destroyed"); 19:21-25 (Court "might disagree" with USAID policies about what constituted a "non-record").

Acting Administrator Rubio was notified of this ongoing destruction of records on March 11,[11] when Plaintiff sent him a letter reminding him of his "mandatory, non-discretionary obligations under the Federal Records Act to preserve federal records . . . [and] establish controls and safeguards against loss or removal." Am. Compl. at ¶ 68; *see also* Exhibit I to Compl., ECF No. 1-1. American Oversight did not receive a response to its letter alerting Acting Administrator Rubio of violations of the FRA, Am. Compl. at ¶ 69, signaling that USAID and Acting Administrator Rubio understood this destruction of federal records, ordered by a senior USAID official, to be compliant with their recordkeeping policies. USAID's policy, as detailed in the March 11th email directive,[12] permits destruction of physical records (both classified and unclassified), including drafts and supporting materials—information clearly "made or received by a Federal agency . . .in connection with the transaction of public business" that evidences the "activities of the United States Government." 44 U.S.C.A. § 3301(a)(1)(A). As pled, American Oversight has more than met its burden to state a "facially plausible claim," *Project on Gov't Oversight, Inc.* ("*POGO*") *v. Nat'l Archives & Recs. Admin.*, No. 23-CV-2564 (DLF), 2024 WL 4286109, at *3 (D.D.C. Sept. 25, 2024), that USAID's policies regarding retention of physical

---

[11] This letter was sent to Rubio at the email address designated for the Archivist, as he concurrently served and continues to serve in both roles. Am. Compl. at ¶ 68.

[12] While USAID may have updated its policy regarding physical records in response to the uproar surrounding this email, that new policy is limited only to physical records located at USAID offices in the National Capital Region. *See infra*, Section II.A.

records violate the FRA by allowing, and in some cases requiring, the destruction of those physical federal records.

Website Records: On January 31, 2025, the then-Acting Administrator at USAID told the agency's IT department to hand the entire USAID digital network to DOGE representatives. Am. Compl. ¶ 40. These DOGE staff then gained access to certain USAID electronic systems. *Id.* at ¶ 41. The day after DOGE representatives gained that access, the entire USAID website was taken offline. *Id.* at ¶ 42. American Oversight sent a letter to Rubio, as acting head of USAID, to bring his attention to the potential unlawful destruction and removal of records through DOGE's interventions and the ongoing turmoil precipitated by the dismantling of the agency. *Id.* at ¶¶ 62, 64; *see also* Exhibit B to Compl., ECF No. 1-1. American Oversight did not receive a response to its initial letter alerting USAID of potential violations of the FRA. Am. Compl. at ¶ 69. The facts alleged suggest that, despite DOGE representatives' access to systems and a subsequent systems blackout, including the shutdown of USAID's entire website, USAID and Acting Administrator Rubio did not understand there to be any violations of the FRA. Taking all allegations in the Amended Complaint as true, the recordkeeping policies of the agency were inadequate to "establish safeguards against the removal or loss of [federal] records," 44 U.S.C. § 3105, as vast swaths of records disappeared from public view during this time. And as noted earlier, USAID still leaves open the possibility of deleting the website records permanently. *See* Kahn Decl. ¶ 8.

American Oversight has thus stated claims for relief. If (as required at this stage of litigation) the Court takes American Oversight's allegations as true and affords it all reasonable inferences, American Oversight has sufficiently alleged inadequate recordkeeping policies that sanctioned and continue to sanction destruction or removal of federal records, including employee and contractor records on government devices during separation; physical records; and records on

USAID's website. The Amended Complaint sets forth allegations of website records that have already been or face the risk of being removed, erased, or deleted; physical records destroyed at the Reagan building by direct orders of senior USAID officials; and electronic records left on employee devices that are or will be remotely wiped. These allegations collectively raise a strong inference of a recordkeeping policy that is not robust enough to protect USAID's federal records as required by law. *See* 44 U.S.C. § 3105 (requiring each agency head to "establish safeguards against the removal or loss of records"). Taken as true, the allegations in the Amended Complaint show that the policies actually followed by USAID are inadequate to protect federal records and thus violate the FRA, and the Court should not dismiss Count I for failure to state a claim.

**B.    Plaintiff Pled Sufficient Facts as to Count Two Alleging Defendants USAID and Rubio Failed to Perform Nondiscretionary Duties Under the FRA by Failing to Recover Records and Report FRA Violations.**

Plaintiff has also sufficiently alleged that Defendants failed to perform nondiscretionary duties under the FRA to recover unlawfully removed or destroyed records, notify the Archivist of known FRA violations, and initiate an action through the Attorney General to recover unlawfully removed or destroyed records.[13] The FRA requires "[t]he head of a federal agency who becomes aware of 'any actual, impending, or *threatened* unlawful removal, defacing, alteration, or destruction of records in the custody of the agency'" to alert the Archivist and initiate action through the Attorney General for the recovery of records that he or she knows or has reason to

---

[13] Again here, Defendants incorrectly state that "Plaintiff points only to two factual allegations in support of its Count Two," Defs.' Br. at 22, ignoring paragraph 127 of the Amended Complaint: "Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein," Am. Compl. ¶ 127.

believe have been unlawfully removed or destroyed. *POGO,* 2024 WL 4286109, at *4 (emphasis in original) (quoting 44 U.S.C. § 3106(a)).

As described in Section I.A.1 above, Plaintiff has alleged that there has been and/or will be "actual, impending, or threatened unlawful removal, defacing, alteration, corruption, deletion, erasure, or other destruction of records" in USAID's custody, *see* 44 U.S.C. § 3106(a)), and the Court at this stage must take these allegations as true. Plaintiff has also clearly alleged that the head of USAID, Rubio, was aware of these actual or impending harms to USAID records. Am. Compl. ¶¶ 62, 64-65 (describing American Oversight's February 5, 2025 letter); 68 (describing American Oversight's March 11, 2025 letter), 70-74, 133-34. Plaintiff also alleged that Rubio, as Acting Administrator of USAID, "did not report violations of the FRA to the Acting Archivist." *Id.* ¶ 75. Thus, American Oversight's claim is sufficiently supported by allegations in the Amended Complaint.[14]

American Oversight's allegations also demonstrate that USAID and its head, Rubio, failed to "initiate action through the Attorney General for the recovery of records." 44 U.S.C. § 3106(a). This enforcement requirement is triggered when the head of the agency "knows or has reason to believe [records] have been unlawfully removed." *Id.* But an agency head's obligation to initiate recovery action may exist even when there has been a "fatal loss" of records. *See Jud. Watch I,* 844 F.3d at 956.

Here, American Oversight has alleged that (1) employees and contractors are unable to access USAID systems before separation, Am. Compl. ¶¶ 53, 55, 74, and (2) Acting Administrator Rubio, having signed off on this agency-wide decision, knows or has reason to believe that federal

---

[14] Plaintiff's Count II claims are not moot, *see* Defs.' Br. at 24, because Defendants have not fulfilled their statutory notification requirements. *See* Section II.C, *infra*.

records could remain on those devices which will not be returned to the agency, *id.* ¶¶ 10, 51-55, 134. Thus, Rubio is aware of records "leav[ing] the custody of" USAID at the time of employee or contractor separation. *See* 36 C.F.R. § 1230.3(b) (defining "[r]emoval" of records as "selling, donating, loaning, transferring, stealing, or otherwise allowing a record to leave the custody of a Federal agency without the permission of the Archivist of the United States"). But he did not fulfill his obligation under Section 3106(a) to initiate action through the Attorney General for recovery of those records. Plaintiff has provided sufficient allegations that USAID and Rubio knew of FRA violations but did not report these to the Archivist or Attorney General; thus, the Court should not dismiss Count II.

### C. Plaintiff Pled Sufficient Facts as to Count III, Alleging Defendants NARA and Rubio Failed to Perform Nondiscretionary Duties Under the FRA to Refer the Issue to the Attorney General.

To state a claim against NARA and Acting Archivist Rubio, American Oversight merely needs to proffer allegations that "(1) identify records that fall under the FRA; (2) allege that those records are being removed or destroyed in violation of the FRA; and (3) allege that . . . the Archivist knew about the FRA violations and yet failed to initiate corrective action." *Price v. U.S. Dep't of Just.*, No. 18-cv-1339 (CRC), 2019 WL 2526439, at *6 (D.D.C. June 19, 2019). The allegations in the Amended Complaint plainly establish these elements.

As described in Section I.A.1 above, Plaintiff identified multiple instances in its Amended Complaint when USAID engaged in unlawful removal or destruction of federal records—not least of which was the destruction of federal records at the Reagan building on March 11, 2025. Am. Compl. ¶¶ 48, 72-73. American Oversight also plainly alleged that Rubio, in his capacity as Acting Archivist, was well aware of these violations and failed to initiate a corrective action. *Id.* at ¶¶ 62-65 (describing American Oversight's February 5, 2025 letter, sent also to then-Archivist Shogan); 67-68 (describing American Oversight's March 11, 2025 letter), 70-73, 142. Additionally, Rubio,

23

"as Acting Archivist who had knowledge of the FRA violations in his position as Acting Administrator as USAID . . . did not initiate an enforcement action through the Attorney General." *Id.* ¶ 76. Thus, American Oversight pled sufficient allegations in the Amended Complaint to survive dismissal of this claim.

This referral duty is not limited to situations where there has been a "removal" of records. *Cf.* Defs.' Br. 23 (claiming such a limit). On the contrary, "the 'deletion, erasure, or destruction' of records triggers the Archivist's referral duty in just the same way as their 'removal.'" *POGO*, 2024 WL 4286109, at \*4 (quoting 44 U.S.C. § 3106(a)). This interpretation of "the statute as a whole," *id.*, is consistent with *Armstrong*'s interpretation that "the FRA expressly provides for judicial review in an action brought by the Attorney General to prevent the *destruction* or removal of records," 924 F.2d at 291 (emphasis added). Courts have agreed in multiple cases that the Archivist must "request the Attorney General to initiate . . . an action" for "recovery [of the records] or other redress," 44 U.S.C. § 3106(b).[15] *See, e.g.*, *Jud. Watch I*, 844 F.3d at 956 (confirming the interpretation of *Armstrong*); *ACLU of Fla. v. U.S. Immigr. & Customs Enf't*, No. 22-cv-01129 (CJN), 2023 WL 6461053, at \*8 (D.D.C. Aug. 31, 2023) ("[S]ection 3106(b) imposes a referral obligation duty on the Archivist as to all forms of record destruction listed in section 3106(a), not just removal."); *Mary Ferrell Found., Inc. v. Biden*, No. 22-cv-06176 (RS), 2023 WL 4551066, at \*9 (N.D. Cal. July 14, 2023) (noting that the legislative history supported the Archivist's referral obligation when "destruction" occurred).

---

[15] While one case, *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.* ("*CREW II*"), No. 22-cv-3350 (TSC), 2024 WL 1178472, at \*11 (D.D.C. Mar. 19, 2024), *vacated in part*, No. 22-cv-3350 (TSC), 2024 WL 4286031 (D.D.C. Sept. 25, 2024), does hold that the referral duty is only triggered by removal of records, "that opinion failed to consider the full context and language of the statute when interpreting § 3106 and 2905," *POGO*, 2024 WL 4286109, at \*5.

Accordingly, because the four corners of the Amended Complaint contain allegations plausibly claiming that NARA and Acting Archivist Rubio have failed to initiate enforcement action through referral to the Attorney General concerning at minimum, the records destroyed at the Reagan building; as well as any records stored on USAID's website, to the extent those records are under impending or threatened removal, alteration, or destruction; and any employee federal records already or imminently destroyed or alienated during the separation process, the Court should deny Defendants' Partial Motion to Dismiss as to Count III.

**II.    THE COURT HAS JURISDICTION OVER THIS CASE, AS AMERICAN OVERSIGHT HAS STANDING TO OBTAIN PROSPECTIVE AND DECLARATORY RELIEF AND NO CLAIM IS MOOT OR NOT REDRESSABLE.**

Beyond stating a claim for relief on all counts, *see* Section I, *supra*, there is no issue of standing, mootness, or redressability that infringes on this court's jurisdiction over the case. Importantly, "[a] factual challenge to the jurisdictional allegations of a complaint . . . is subject to a significant limitation"—generally those challenges should be decided after the merits of a case are heard. *Am. Oversight*, 498 F. Supp. 3d at 153 (citing *Herbert*, 974 F.2d at 198). Thus, where there are factual disputes implicating jurisdiction, the court should deny a motion to dismiss under Rule 12(b)(1) and defer consideration of jurisdictional questions until "the parties have had an opportunity to develop a more complete record." *Id.* at 148. Here, Plaintiff has standing to obtain both prospective and declaratory relief because there is ongoing and future injury to Plaintiff's interests, and its claims regarding both unlawful destruction of records and USAID's notification obligation to NARA are both redressable and not moot.

25

> **A.      Plaintiff Has Established Likelihood of Future Injury Due to Ongoing and Continuing Misconduct by USAID, NARA, and Rubio, and Declaratory Relief Would Afford Plaintiff Concrete Relief.**

Plaintiff has standing to allege Counts I, II, and III of the Amended Complaint because it can demonstrate sufficient likelihood of future injury to its interests. Article III requires that plaintiffs establish "the irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), that they have "suffered an injury in fact," *Ameen v. U.S. Dep't of State*, No. CV 21-1399 (BAH), 2021 WL 4148532, at \*2 (D.D.C. Sept. 13, 2021) (quoting *Lujan*, 504 U.S. at 560). The injury must be "concrete," "particularized," and "actual or imminent," and in the case of prospective declaratory or injunctive relief, "plaintiff must establish sufficient likelihood of future injury." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Defendants challenge only one element of the four: Plaintiff's allegations of future injury, Defs.' Br. at 9-13.

Here, American Oversight has demonstrated likelihood of future injury as to Count I, as related to employee and contractor records not already saved on USAID systems; physical records; and records stored on USAID's website, to the extent they are subject to impending or threatened removal, alteration, or destruction. It has also demonstrated likelihood of future injury as to Counts II and III if Defendants do not comply with their obligations under the FRA to notify and refer the case to those who can enforce the law.[16]

Where a plaintiff challenges an agency's recordkeeping policy and has "currently pending FOIA requests," like American Oversight here, the plaintiff has standing to seek prospective relief.

---

[16] Plaintiff's Amended Complaint does not include a prayer for specific injunctive relief related to Plaintiff's FRA claims, though it does seek "any other relief this Court deems appropriate." Am. Compl. at 32. If this Court finds it cannot at this time find likelihood of future injury without a specific request for prospective relief, American Oversight asks that it be allowed to amend its complaint to clarify prospective relief instead of dismissal.

*Citizens for Resp. & Ethics in Wash. v. Sec. & Exch. Comm'n* ("*CREW I*"), 858 F. Supp. 2d 51, 60 (D.D.C. 2012). Plaintiff American Oversight is a "nonprofit organization" that "routinely files FOIA requests, giving it a strong operational interest in Defendants' compliance with their recordkeeping obligations under the FRA," and here "Defendants' alleged violations of the APA have caused a delay in access to records Plaintiff claims it is entitled to receive through FOIA" which impedes Plaintiff's work. *CREW II*, 2024 WL 1178472, at *6 (cleaned up), *see also* Am. Compl. ¶¶ 17-18. That is sufficient to establish prospective injury. *CREW II*, 2024 WL 1178472, at *6; s*ee also Citizens for Resp. & Ethics in Washington v. Exec. Off. of President*, 587 F. Supp. 2d 48, 60-61 (D.D.C. 2008) (determining that plaintiffs "plead injury in fact supporting their claims for injunctive relief" because "they have FOIA requests for e-mails currently pending . . . and intend to file future requests for e-mails").

Despite Defendants' claims to the contrary, Defs.' Br. at 10, the Amended Complaint is clear that the five specific FOIA requests underlying Plaintiff's claims in this case for FOIA violations are not American Oversight's only FOIA requests pending with USAID. *See* Am. Compl. ¶¶ 17 ("As part of its work, American Oversight has submitted FOIA requests to USAID and will continue to seek records from the agency or its replacement in the future."), 18 (noting that "[s]ince February 4, 2025, American Oversight has submitted 22 FOIA requests to USAID" and had received no responses), 59-61 (describing Plaintiff's six FOIA requests submitted on February 4, 2025), 67 (describing Plaintiff's two FOIA requests submitted March 11, 2025); 77-78; 82-114. In 2025, American Oversight has submitted 23 FOIA requests to USAID, 16 of which remain open with no substantive response. Third Lewis Decl. ¶ 8.

Plaintiff, having limited its claims to (1) employee and contractor records not already saved on USAID systems; (2) physical records; and (3) records stored on USAID's website, to the extent

27

they are subject to impending or threatened removal, alteration, or destruction, can demonstrate prospective injury for all three categories of information.

Employee and Contractor Records: As described in Section I.A.1, *supra*, Plaintiff has alleged likelihood of future injury as to employee and contractor records not already saved on USAID systems as individuals are separated from the agency and go through the offboarding process. While USAID's written policies require departing individuals to confirm that they have transferred "electronic documents on personal electronic devices . . . to an accessible recordkeeping system or to your supervisor and/or successor," Kahn Decl. ¶ 7, this confirmation does not cover the devices American Oversight is concerned about: "government-issued devices." Am. Compl. ¶¶ 51, 55, *see also* Kahn Decl. ¶ 3 (stating that "USAID will remotely wipe the [Government Furnished Equipment]").

A departing individual could truthfully confirm that they have transferred all federal records on any *personal* devices, which are not the devices USAID plans to or has already remotely wiped. Instead, the devices issued by USAID that would normally be returned to the agency upon departure remain with former USAID employees and contractors and are not included in the offboarding confirmations at all. And even if the departing individual has complied with their obligation to transfer federal records on a government issued device to a "supervisor and/or successor," Kahn Decl. ¶ 7, USAID's offboarding policy assumes that there *will be* a supervisor or successor. This is almost certainly not the case under these circumstances, where an entire agency is being dismantled and the vast majority of its employees subject to Reduction-in-Force orders. *See* Am. Compl. ¶¶ 3, 10, 50. If a departing individual's supervisor has already separated from the agency and the individual emails their supervisor a federal record saved on that device,

then the individual has nominally fulfilled their obligation under the offboarding policy, even though that email may disappear into a void and never be saved on USAID systems.

This category of removed or destroyed records could include records responsive to, for example, Plaintiff's Key Terms Communications Request, which seeks communications from specified USAID employees containing any of a list of 29 key terms. Am. Compl. ¶¶ 83-85. Thus, "a real risk of documents [responsive to American Oversight's FOIA requests] being unavailable exists" where USAID's recordkeeping policies are plainly insufficient to preserve all electronic records saved on government-issued devices. *CREW I*, 858 F. Supp. 2d at 60. That risk is sufficient to demonstrate likelihood of future injury.

<u>Physical Records</u>: Plaintiff has also alleged likelihood of future injury as to physical records other than those covered by the agreed-upon policy for decommissioning Washington, D.C.-area offices. American Oversight agrees with Defendants that the revised proposal provided to Plaintiff on April 30, 2025, complies with the FRA and thus Plaintiff does not argue it has future injury as to those specific records. *See* Defs.' Br. at 12. However, that policy is limited to "physical records" in "USAID spaces in the National Capital Region." Heiman Decl. Ex. C, ¶¶ 13-14. USAID was an international agency, with offices around the United States and the globe.[17] Therefore, the agreed-upon policy only covers a portion of the total number of physical federal records in USAID's custody.

---

[17] For example, as of June 2024 USAID had remote employees in 43 states. Agency for International Development (USAID) Remote Workers by State, as of June 2024, Gen. Servs. Admin., https://files.gao.gov/multimedia/gao-25-107363/interactive/107363_map_USAID.html (last visited Aug. 20, 2025). USAID's Office of the Inspector General had offices in Pretoria, Bangkok, Tel Aviv, Kyiv, and San Salvador. Offices and Organization Chart, Office of the Inspector General, USAID, https://oig.usaid.gov/offices (last visited Aug. 20, 2025).

Furthermore, as Defendants have attested, the destruction of records on March 11, 2025 was done "in accordance" with the agency's recordkeeping policies regarding physical records, which may not adequately cover all records subject to the FRA's preservation requirements. *See* Carr Decl. ¶ 7, *see also* Tr. at 17:14-17 ("destruction . . . was subject to instructions that were given by the relevant USAID staff"). As the Court has stated, those instructions, including "the definition of non-records" was "problematic," because "records that need to be preserved" would not have been. *Id.* at 18:7-11; *compare* Carr Decl. Ex. A ("Examples of non-records that can be disposed include . . . drafts, duplicates, working papers, reference copies, [and] personal notes."), *with* 44 U.S.C. § 3301(a)(1)(A) (defining "records" as including "all recorded information . . . made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved . . . as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them").

The evidence available therefore indicates that USAID, applying its policy, will continue to treat physical records outside the National Capital Region offices as non-records and fail to preserve them. Indeed, despite the Court's skepticism that the agency's definition of non-records complied with the FRA, as the agency's first proposal for records disposition of D.C.-area records proposed to treat "training/reference materials/pamphlets/binders" as non-records. *See* Heiman Decl. Ex. B. However, to the extent these records were used in the transaction of USAID business, they would be federal records that should be preserved. *See* 44 U.S.C. § 3301(a)(1)(A). After American Oversight objected on those grounds, USAID relented from their destruction. *See* Heiman Decl., Ex. B. The Court may "provide relief" as to records, like USAID's physical records

30

outside the D.C. area, that are subject to "looming" destruction that "the Attorney General could prevent." *Hegseth*, 2025 WL 1721995, at *9.

American Oversight also continues to suffer injury as to the records destroyed on March 11, 2025 as those documents continue to be "unavailable" to Plaintiff and not made public in response to its FOIA requests. *CREW I*, 858 F.Supp.2d at 60. These records include "drafts," "reference materials," "unclassified" and "classified documents that staff printed as supporting materials," any of which may be responsive to one or more of American Oversight's pending FOIA requests. *See* Am. Compl. ¶¶ 72-73, 82-114; *see also* Third Lewis Decl. ¶ 8. Defendants could remedy this injury through taking steps to recover the records or referring the matter to the Attorney General, but they have refused to do so. *See* Section II.B, *infra.* Thus, Plaintiff has demonstrated likelihood of future injury as to the ongoing harm from the destroyed D.C.-area records and future unavailability of physical records from outside of D.C.-area USAID offices.

Website Records: Finally, American Oversight can demonstrate likelihood of future injury as to USAID's website records, to the extent that information on the website is subject to threatened or impending deletion. According to Defendants, the USAID "website still exists on the USAID systems," though "access to that website is currently restricted." Kahn Decl. ¶ 8. However, USAID does not promise that these records will not be deleted in the future, a glaring omission from its declarations. *See generally* Kahn. Decl. Instead, its declarant says only that discussions are "ongoing" with Department of State, and "[t]he status of those materials and how they will be housed has not yet been determined." *Id.* ¶ 8. To the extent that USAID plans (or at least refuses to disclaim the option) to delete its stored website records as the agency is dismantled, Plaintiff will suffer future injury to its interests in its pending and future FOIA requests. One pending request, for example, seeks information sufficient to identify the name and job title of

31

employees assigned to the foreign assistance review program and guidance governing the foreign assistance program review office—information that may be on USAID's website and subject to impending disposal. Am. Compl. ¶¶ 100-104. The court could redress this injury by, *e.g.*, ordering USAID not to destroy any records from its now-offline website (or those subject to pending FOIA requests), or ordering USAID to produce a sworn declaration that it will not do so.

Plaintiff's injury, as demonstrated by its almost two-dozen open FOIA requests, is that USAID's recordkeeping policies compromise and will continue to compromise federal records responsive to American Oversight's FOIA requests and increase the likelihood that Plaintiff will be unable to obtain the responsive federal records that it is entitled to under FOIA. Am. Compl. ¶ 124. Plaintiff has demonstrated injury sufficient to obtain prospective relief and thus has also demonstrated injury for this Court to exercise its jurisdiction and grant injunctive and declaratory relief. Thus, Plaintiff has standing to bring Counts I, II, and III.

**B.** **Plaintiff's Claims Regarding USAID's Records Destruction are Both Redressable and Not Moot Because Defendants Have Not Established Records Are Uncoverable.**

Even if, as Defendants seem to think, Plaintiff's Count II were limited solely to unlawful destruction of records at the Reagan Building in March 2025 (it is not), *see* Am. Compl. ¶¶ 127-140, that claim is both redressable and not moot. "Standing is assessed 'at the time the action commences.'" *Advanced Mgmt. Tech., Inc. v. Fed. Aviation Admin.*, 211 F.3d 633, 636 (D.C. Cir. 2000) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.,* 528 U.S. 167 (2000)). At the time this action was commenced in March 2025, and when the Amended Complaint was filed in May 2025, Defendants had not performed nondiscretionary duties under the FRA to recover records, notify the Archivist of known FRA violations, and initiate an action through the Attorney General to recover unlawfully removed records. Furthermore, they have yet to meet their obligations under Section 3106, and thus the claim is not moot.

Defendants attempt to shoehorn this claim into standing, rather than mootness, because the burden is higher on Defendants (as the party raising the issue) to demonstrate that the claim is moot. *See Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 459 (D.C. Cir. 1998), *see also* Defs.' Br. at 14. But where a lack of standing is based on the "fatal loss" of records, and thus mootness, "the Government bears the burden of establishing fatal loss of the[] records." *Cause of Action Inst. v. Pompeo*, 319 F. Supp. 3d 230, 234 (D.D.C 2018). In an FRA case, "the bar for establishing mootness . . . is a high one" that only applies when "an agency's own remedial efforts succeed in recovering *every* reasonably acquirable record." *Am. Oversight*, 498 F. Supp. 3d at 154 (emphasis added). Courts in this Circuit have repeatedly exercised jurisdiction over similar FRA claims where agencies could not prove with certainty that an "enforcement action could not shake loose a few more [records]." *Jud. Watch I*, 844 F.3d at 955.

33

Agencies must engage in robust recovery efforts to demonstrate that an FRA claim under Section 3106 is not enforceable. *See, e.g.*, *Jud. Watch, Inc. v. Pompeo*, 744 F. App'x 3, 4 (D.C. Cir. 2018) (unpublished decision) (upholding the district court's dismissal of plaintiff's claim as moot only after "the FBI's thorough investigation" was concluded and it was clear that an enforcement action would not result in the recovery of additional records); *Am. First Legal Found.*, 2025 WL 1726025, at *5 (dismissing case as moot where agency's Chief Information Officer declared that "the agency and its email service provider ha[d] obtained copies of as many of the deleted records as possible . . . [and] 'no known methodology' can recover the [remaining] data"); *CREW II*, 2024 WL 1178472 at *6 (dismissing for lack of standing based on "declarations explaining that the [records] are unrecoverable"); *Cause of Action Inst.*, 319 F. Supp. 3d at 233 (dismissing plaintiff's claim as moot after Secretary Powell confirmed "under penalty of perjury" that he had no further access to unlawfully removed records or information that could aid in their recovery and after Secretary Powell's email service provider's legal team provided written confirmation that further recovery was "not technologically possible.").

The Defendants in those cases undertook the rigorous recovery actions that eventually allowed them to moot the plaintiffs' claims only *after* courts first denied motions to dismiss those actions. Without appropriate judicial review, the agencies would likely not have carried out the extensive recovery efforts that courts later found sufficient to comply with the FRA—and to have obviated the need to initiate enforcement through the Attorney General.

But here, Defendants have not met this high burden—in fact, Defendants have not shown they have taken *a single action* to recover the shredded records. Even if Defendants had taken "*some* action," that would not eliminate judicial review of Plaintiff's claim—even a "sustained effort" by an agency to recover the removed records, "yielding a very substantial harvest," does

not prevent judicial review of Plaintiff's claim that Defendants were required to initiate an enforcement action. *Jud. Watch I*, 844 F.3d at 956 (emphasis in original) (holding that defendants were required to initiate an enforcement action through the Attorney General to recover records unlawfully removed through Secretary Clinton's use of personal email after asking for the records voluntarily from Secretary Clinton and the FBI); *see also Cause of Action Inst. v. Tillerson*, 285 F. Supp. 3d 201, 208 (D.D.C. 2018) (exercising jurisdiction and refusing to dismiss the plaintiffs' claim where the defendant agency asked for Secretary Powell's voluntary compliance to recover federal records from his personal email account).

Defendants' own evidence suggests that the documents destroyed on March 11, 2025 were shredded, not burned, as the classified shredders were in use and "burn bags [were] securely stored within the Ronald Reagan Building for future destruction." Carr Decl. ¶ 12. It is possible, under some circumstances, to reconstruct and recover shredded documents, and thus may be possible to recover these shredded documents. In addition, if there were documents that were destroyed by methods other than shredding or burning at the Reagan Building, it may be possible to recover those records. But Defendants do not provide any evidence they have even tried, which is the minimum effort required to establish mootness.

At this stage, it is too early to know for certain, as is required, that "shaking the tree harder," or even at all, would not allow the agency to recover records. *Jud. Watch I*, 844 F.3d at 955. Nor must the court decide, at this preliminary stage, whether to issue an order to do so—a question for final relief. The only point here is that the Court holds jurisdiction to hear Count II.

### C.   Plaintiff's Claims Regarding USAID's Mandatory Reporting Requirement to NARA Are Not Moot.

Plaintiff's request that the Court order the head of USAID to notify the Archivist of records at risk of or actively being removed or destroyed, as is his mandatory duty under 44 U.S.C.

§ 3106(a), is live. Neither the Acting Administrator, nor anyone at USAID, has taken any such action.

A claim is only moot if "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Larsen v. U.S. Navy*, 525 F.3d 1, 3 (D.C. Cir. 2008) (quoting *County of L.A. v. Davis*, 440 U.S. 625, 631 (1979)). When considering mootness, the court must assume that the plaintiff "would be successful on the merits." *Jud. Watch I*, 844 F.3d at 955. Here, the issues are still live because USAID's communications with NARA do not fulfill the duties required of the agency and its head under 44 U.S.C. § 3106(a). That statute is not satisfied by telephone exchanges with NARA staffers; it requires the agency head himself to initiate a specific process leading to the possibility of an Attorney General enforcement action.

Section 3106(a) of the FRA leaves the agency head "*no* discretion to determine which cases to pursue." *Jud. Watch I,* 844 F.3d at 954 (emphasis in original) (quoting *Armstrong*, 924 F.2d at 295). That is because the purpose of this notification and the Archivist's involvement is to ensure that the agency and Archivist are pursuing the common goal of recovering removed records. *See* 44 U.S.C. § 3106(a). This may be achieved through an agency's "own remedial measures" or an enforcement action "through the Attorney General if those efforts are unsuccessful." *Jud. Watch I,* 844 F.3d at 954.

But Defendants have not stated that the agency head, nor *anyone* at USAID, fulfilled Section 3106(a)'s notification duty. *See generally* Defs.' Br. Instead, they utilize murky language to obfuscate the fact that they do not assert that anyone at USAID, let alone the agency head, completed this notification obligation under the FRA. *See, e.g., id*. at 16 (noting that "NARA *was made aware* of an allegation of unauthorized disposition of USAID records from various sources"

and characterizing Plaintiff's claim as saying the Archivist *should have been* engaged" without identifying individuals responsible for taking such actions (emphasis added)).

American Oversight's claim is not that "the Archivist *should have been* contacted regarding USAID," Defs.' Br. at 16 (emphasis added), because that is not what the law requires. Plaintiff is well aware that the Archivist was made aware of potential and actual records removal or destruction at USAID, because Plaintiff was one of the individuals or organizations doing the notifying. *See* Am Compl. ¶¶ 62, 64-65 (describing American Oversight's February 5, 2025 letter); 68 (describing American Oversight's March 11, 2025 letter), *see also* Fischer Decl., ECF No. 7-1, ¶ 5 (stating that "NARA was made aware of an allegation of unauthorized disposition of USAID records from various sources"[18]). Defendants' use of the passive tense conceals the crucial fact it was not USAID involved in doing the notifying. It is not enough that the Archivist is notified from an outside source. Rather, the Acting Administrator of USAID had his own distinct obligation under the FRA to report actual or threatened removal of documents and has failed to do so.

The fact that NARA and USAID have communicated regarding "allegations of improper disposition of records" and are "working together with respect to records disposition," Defs.' Br. at 24, does not obviate the USAID Administrator's notification requirement. Agency notification to the Archivist is important because it is the prerequisite for an action through the Attorney General to actually recover records, and requires the agency's participation. *See* 44 U.S.C. § 3106(a). Only if the agency head fails to initiate an action for recovery and redress "within a

---

[18] NARA's website states that the three cases opened on March 14, 2025 relating to USAID originated from a message left for NARA appraisal staff by "USAID staff;" a letter submitted by American Oversight; and simply "an allegation." *Unauthorized Disposition of Federal Records*, NARA, https://www.archives.gov/records-mgmt/resources/unauthorizeddispositionoffederalrecords (last visited Aug. 20, 2025).

reasonable period of time" must the Archivist request the Attorney General initiate an enforcement action. *Id.* § 3106(b).

To the extent Defendants argue that informal cooperation with NARA is the functional equivalent of fulfilling the notification requirement, they are wrong. Defendants cite the declaration of NARA Acting CRO William Fischer to support their claim that NARA is "engaged" in the disposition of records at USAID. Defs.' Br. at 16. But that declaration merely states that a USAID Agency Records Officer answered some questions by telephone on March 11, 2025 about the disposition of records at the Reagan building. Fischer Decl. ¶ 8. The declaration also states that NARA requested further information from USAID about the records alleged to be improperly destroyed, and asked for a response within 30 days. *Id*. ¶ 10. Defendants have not provided any evidence that they responded to that letter, and the case status remains open as "[p]ending review/follow up."[19] Therefore, there is no evidence that the communications between NARA and USAID have the same force as, or form part of, the process required by Section 3106(a) to recover records. Finally, this so-called "notification" is limited to the records destroyed on March 11, 2025 and do not cover any other records (*e.g.*, electronic records on government-issued devices; physical records outside Washington, D.C.; and website records) that are the subject of this litigation.

As Acting Administrator Rubio has not fulfilled his obligation to notify the Archivist, and the communications between NARA and USAID are not equivalent to this notification requirement, "the issues presented are . . . live," *Larsen*, 525 F.3d at 3, and thus the Court should not dismiss Count II as moot.

---

[19] *See Unauthorized Disposition of Federal Records*, NARA, https://www.archives.gov/records-mgmt/resources/unauthorizeddispositionoffederalrecords (last visited Aug. 20, 2025).

**CONCLUSION**

Based on the foregoing and all other materials in the record, Plaintiff American Oversight

respectfully requests that the Court deny Defendants' Partial Motion to Dismiss, ECF No. 16.

Dated: August 20, 2025

Respectfully submitted,

*/s/ Emma Lewis*
Emma Lewis
D.C. Bar No. 144574
Loree Stark
D.C. Bar No. 90021926
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 919-6303
Emma.lewis@americanoversight.org

*Counsel for Plaintiff*

39